Harry Melvin KENDRICKS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Oct. 28, 1977.

Stephen R. Veth, David Kaplan, David M.
Lewis, Louisville, for appellant.

Robert F. Stephens, Atty. Gen., William
W. Pollard, Asst. Atty. Gen., Frankfort, for
appellee.

JONES, Justice.

On June 3, 1976, Harry Melvin Kendricks
was convicted of the offenses of first de-
gree robbery and of being a persistent fel-
on. In conformity with the jury's verdict,
Kendricks was sentenced to a term of 27
years' imprisonment. From that judgment,

Kendricks appeals. Upon Kendricks' motion, this court ordered an appeal from an order overruling a motion to vacate the judgment pending in the Court of Appeals transferred to this court. These appeals involve one of the same issues and are considered together. In support of his argument for reversal, Kendricks alleges five errors: (1) he was denied the right to properly confront his accuser; (2) he was entitled to a "missing witness" instruction; (3) the Commonwealth's Attorney refused to disclose exculpatory evidence; (4) the Commonwealth's Attorney misused a prior felony conviction for grand larceny to his prejudice; (5) the evidence failed to establish that he was a persistent felony offender beyond a reasonable doubt.

The pertinent facts are as follows: On January 7, 1976, Dan Schnorbus was employed as a parking lot attendant at the Jewish Hospital in Louisville. It was his duty to take the tickets from those leaving the lot and collect the fees. Schnorbus was performing these duties, "at about to approximately 5:30 [P.M.] . . . a man approached me . . . and asked if he could have change for . . . $5.00 bill in quarters." Schnorbus said, "Well, I don't give out any money . . . ." At that point, the robber pulled a gun, threw Schnorbus a paper bag and told him to put all the money in the bag. The robber demanded Schnorbus to "hurry up, hurry up or I'll blow your head off."

Schnorbus did as he was told. He tried to lay down in a small cubicle in which he worked. The assailant took the money, about $75.00, and left by way of the emergency exit at Jewish Hospital. Schnorbus faced his assailant from a distance of three feet, and observed him for approximately 20 seconds.

Schnorbus called the police. He identified his assailant as being about 6 feet in height, weighing approximately 150 pounds and about 40 years old. He described the robber as having a mustache. He was wearing a brown suede coat and brown pants.

Sometime between 9:00 and 10:00 P.M., the police took Schnorbus to the police station. From the time of the robbery until he went to the police station, the police had apparently apprehended Kendricks by the description Schnorbus gave them. Schnorbus identified Kendricks from one picture out of many shown him. Subsequently, he identified Kendricks as his assailant in a police line-up of six black males.

Kendricks' defense was an alibi. He, and three witnesses testified that they were at the home of Kendricks' sister, "socializing" (drinking, listening to music, and playing cards) from 5:30 P.M. until 10:00 P.M. or later.

Kendricks first contends he was denied the right of confrontation due to his inability to cross-examine Schnorbus about his Navy background. On direct examination Schnorbus revealed that he had some training in identification procedures while in the Navy. Schnorbus declined to describe fully his Navy experience for the reason that it concerned classified military information. Kendricks argues that this constituted a denial of his right of confrontation. He contends that Schnorbus was presented as one specially qualified to make identifications and was allowed to give opinion testimony.

Kendricks' argument is unfounded. Schnorbus was testifying as an eyewitness. He was not asserting an opinion, but was testifying to what he had observed during the robbery. Schnorbus identified a photograph of Kendricks from one out of many presented him. Likewise, he identified him in a police line-up. At trial he positively identified Kendricks as the man who robbed him.

The fact that the Commonwealth's Attorney did not call the investigating police officer to the stand is merely a matter for a weak and futile argument. There is absolutely no authority for a "missing witness" presumption or an instruction on this presumption.

There is no merit in Kendricks' argument that the failure of the Common-

wealth's Attorney to produce the "squawk" report, which is a term used by the police to identify the initial police report, constituted error. At a pre-trial hearing, Kendricks' attorney stated there was an initial report which was sent out by the police at 5:45 on January 7, 1976, a short time after the robbery. He also indicated that there was a later clearance report. Counsel for Kendricks was given the second report, but not the first. As a matter of fact, there is nothing in the record that shows but the one "squawk" report. The record also reveals that the Commonwealth's Attorney did not know of a first report. Therefore, all of the squawking about a "squawk" report of doubtful existence is just that—squawking. Therefore, it was not error on the part of the Commonwealth's Attorney to produce a report about which he knew nothing, and was of doubtful existence.

■ Kendricks' next complaint is that the Commonwealth's Attorney misused his previous conviction for grand larceny. Kendricks admitted this conviction on direct examination, and the trial court properly admonished that evidence pertaining to the conviction could be considered only in connection with Kendricks' credibility as a witness. Actually, Kendricks' counsel opened the matter when he asked Kendricks if he had ever been convicted of a felony. In response to his attorney's questioning, Kendricks' last remarks on direct examination were: "No, I never robbed him, I never robbed nobody at no time." Since counsel for Kendricks had avoided mentioning that the previous conviction was for stealing property, the prosecutor followed up this statement with a series of questions ending with:

> "Q. You never robbed anybody, have never taken any property from nobody, is that what you're saying?"

Counsel for Kendricks objected to these questions and moved the trial court that the entire line of questioning be ignored. That line of inquiry was abandoned. No further relief was requested at the time and this court is not inclined to grant such relief on this appeal. See *Humphrey v. Common-*

*wealth,* Ky., 442 S.W.2d 599 (1969). It is true that the records of the Jefferson Circuit Court, which were read to the jury for the purpose of establishing Kendricks' conviction for two prior felonies, did not affirmatively show that the guilty pleas upon which the convictions were based were freely and voluntarily entered. The Commonwealth did not prove that the trial court ever signed the judgments in the order book. However, Kendricks has not alleged that either of these possible defects in the validity of these convictions exist. The record does reveal that on each of the convictions Kendricks was represented by able counsel. Upon being sentenced he was asked in the presence of his counsel if he had any reason to show why he should not be sentenced on the convictions. No reason was shown. This court is of the opinion that the presumption of regularity of the Jefferson Circuit Court orders precludes Kendricks from speculating that the recorded convictions are invalid. *Ingram v̂. Commonwealth,* Ky., 427 S.W.2d 815 (1968).

■ Kendricks' contention that the evidence failed to establish his status as a persistent felony offender beyond a reasonable doubt is refuted by the record. Kendricks contends that the Commonwealth's Attorney failed to prove the date of the first prior offense charged against Kendricks. The record reflects that on February 14, 1969, he pled guilty to the charge and received two years in the penitentiary. It is also noted that on October 23, 1970, Kendricks pled guilty to the second prior offense charged in the indictment.

It is true that the evidence fails to establish that Kendricks was 18 years of age at the time of the commission of the two prior felonies. That requirement is a specific prerequisite under KRS 532.080(2)(b). However, the initial police report filed as an exhibit by counsel for Kendricks, reveals that Kendricks was born August 19, 1945. When he pled guilty to the first prior offense in 1969, he was 24 years of age. When he pled guilty to the prior charge in 1970, he was 25 years of age. In reviewing Kendricks' testimony, his attorney asked

Kendricks, "Q. Harry, beginning back about 1965 when you were drafted would you briefly go through what you have been doing for the last 10 years. A. Yes, sir." [The evidence of Kendricks shows he served 23 months in military service]. That testimony, coupled with the date of his birth, indicates that he was 20 years of age at the time he was drafted. Because Kendricks was 24 years of age at the time judgment was rendered on the first prior felony, and was 25 years of age at the time judgment was rendered on the second prior conviction, it can be reasonably inferred that he was over 18 at the time he committed each of the offenses. If he had been 18 at the time he committed the first offense, it is unlikely that any court would wait 6 years to try a person charged with a criminal offense. Thus, the totality of the evidence is such that the circumstances allowed the jury to conclude that the prior offenses were committed after Kendricks reached the age of 18. In any event, there was no objection interposed by counsel for Kendricks concerning Kendricks' age at the time the prior offenses were committed.

Therefore, the judgment is affirmed in these consolidated appeals.

All concur.